Kurt F. FROEBEL, Plaintiff,

v.

George E. MEYER, et al., Defendants.

No. 97–C–654.

United States District Court,
E.D. Wisconsin.

July 30, 1998.

William S. Roush, Jr., Davis & Kuelthou, Milwaukee, WI, for Plaintiff.

Phillip Peterson, Wis. Dept. of Justice, Donald P. Gallo, Michael, Best & Friedrick, Milwaukee, WI, for Defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Kurt Froebel brings this action under the citizen suit provision of the Federal Water Pollution Control Act, commonly called the Clean Water Act ("CWA" or "Act"), codified as amended at 33 U.S.C. §§ 1251–1387. Froebel alleges that defendants, who include the Wisconsin Department of Natural Resources ("DNR"), two DNR officials and Waukesha County, violat-

ed and continue to violate the Act by discharging pollutants into the Oconomowoc River and North Lake without the requisite permits, as a result of the DNR's poorly executed removal of Funk's Dam 1992.

This case and the defendants' motions to dismiss raise several novel and the legal issues including: (1) the viability of the *Ex parte Young* doctrine in the context CWA violations after two recent Supreme Court decisions on sovereign immunity[1]; (2) the DNR's potential accountability under a federal statute such as the CWA for non-enforcement actions performed under discretionary authority granted by Wisconsin law; and (3) the application of the relevant CWA permitting provisions, 33 U.S.C. §§ 1342 and 1344, to a fact situation involving dam *removal*, rather than dam construction or operation.

Count I of plaintiff's complaint alleges that defendants failed to secure a permit under 33 U.S.C. § 1342 or the analogous state permit provisions, Wis.Stat. § 283.31–.63, for the removal of Funk's Dam in 1992, or for the consequent and ongoing redeposit of silt and sediment into the downstream waters of the Oconomowoc River and North Lake. The plaintiff alleges that this shifting of sediment constitutes a "discharge of [a] pollutant" under 33 U.S.C. § 1311, or an "addition of [a] pollutant to navigable waters from [a] point source" as defined in § 1362(12)(A), requiring defendants to obtain the necessary permits.

Count II of plaintiff's complaint alleges that defendants failed to secure a permit under 33 U.S.C. § 1344 for the 1992 dam removal or for the same resulting transfer of sediment downstream, which allegedly continues to occur. The plaintiff claims that this transfer constitutes a "discharge of dredged or fill material" under § 1344 requiring defendants to obtain a permit from the Army Corps of Engineers, the entitle that issues and administers this permit provision. *See* 33 U.S.C. § 1344(d).

All defendants filed motions to dismiss. The state defendants raise defenses of sovereign immunity, claim preclusion growing out of prior state administrative proceedings, and failure to state a claim upon which relief can be granted. Accordingly, they move to dismiss both counts under Rule 12(b)(1), for lack of subject matter jurisdiction; and Rule 12(b)(6), for failure to state a claim. *See* Fed.R.Civ.P. 12(b). Waukesha County, which purchased the riparian property abutting Funk's Dam and the dam impoundment in December 1993, also moves to dismiss both counts under Rule 12(b)(6), for failure to state a claim upon which relief can be granted. *Id.* Based on the following analysis, I will grant the Wisconsin defendants' 12(b)(1) motion to dismiss because of sovereign immunity as to the DNR, but deny it as to the DNR officials. The remaining defendants' 12(b)(6) motions to dismiss will be granted on both counts.

## I. FACTUAL BACKGROUND

The following facts are taken from the complaint and from the factual findings of Administrative Law Judge Jeffrey D. Boldt ("ALJ Boldt"), incorporated into the complaint by reference. *See In re Removal of Funk's Dam*, No. 3–SE–92–322 (Div. of Hearings and Appeals Feb. 21, 1996) ("ALJ Decision").

Funk's Dam sits approximately one mile upstream of North Lake on the Oconomowoc River in Waukesha County. Originally built in 1850 and later rebuilt several times, the dam first washed out in 1965. In 1971, the DNR notified the dam owner, Gerald Quinn, that the dam was in poor condition and needed repairs. The dam failed again in March 1975, prompting the DNR to issue an order requiring Quinn to repair the dam. Quinn refused to comply. In 1982, the DNR issued a determination that the dam was unsafe and had been abandoned and gave notice of the agency's intention to remove it. Quinn challenged the DNR determination. Although the challenge was ultimately dismissed by the Wisconsin Court of Appeals in 1985, dam removal was delayed.

---

1. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *and Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

The Wisconsin legislature appropriated funds for removing abandoned dams in August 1991, and the DNR began preparations to remove Funk's Dam. On August 17, 1992, the DNR began a drawdown of the reservoir, or impoundment, behind the dam in anticipation of removal. On the following day, a public notice was issued, requesting comments on the dam removal and seeking input on the DNR's related Environmental Assessment ("EA"). A public informational hearing was held on September 9, 1992 regarding the imminent removal of the dam. At the hearing, DNR representatives assured the public that the agency's removal plan would guard against a significant or harmful environmental impact to downstream waters. In its EA, the DNR did observe that "an increase in sediment load to the lake is expected during drawdown." An Environmental Impact Statement ("EIS") on the dam removal project was never prepared, however, as the DNR determined that one was not needed. *See North Lake Management Dist. v. Wisconsin Dep't of Natural Resources,* 182 Wis.2d 500, 503, 513 N.W.2d 703 (Ct.App. 1994).

On October 2, 1992, the DNR contractor began the physical removal of the dam. At that time, Funk's Dam consisted of several 3–foot section gates, a 60–foot emergency spillway, and a 350–foot earthen embankment. No one disputes that the dam was unsafe and a menace to life, health, and property. The DNR's foremost concern was the potential for flooding due to dam failure. In addition, the agency believed dam removal would reduce sediment transport by stabilizing the impoundment bottom. ALJ Boldt subsequently found that a clear preponderance of the evidence established that the DNR's decision to remove the dam was reasonable, given the serious concerns about public safety and sediment transport. ALJ Decision, Findings at ¶ 10.

Plaintiff Froebel cites poor implementation of the decision to remove the dam rather than the decision itself as the source of the environmental consequences giving rise to this litigation. In 1986, the DNR had conducted a study on the depth and distribution of the sediment upstream of Funk's Dam, with the object of predicting the relative consequences of dam removal and dam failure. In addition, DNR Assistant Dam Safety Engineer William Sturtevant, a named defendant in this action, prepared a formal drawdown plan in 1992. Both the 1986 study and the Sturtevant plan recommended certain steps be taken to ensure that the sediment transport triggered by dam removal was minimized.

Again, no one disputes that the DNR did not follow these recommendations in significant respects during dam removal. Specifically, no sediment basin or sediment barrier was placed upstream of the dam; downstream sediment traps were too small and were not properly pumped during removal; no pumps or siphons were installed along the embankment prior to drainage; and the dam itself was only partially removed, although the DNR's own EA had warned that partial removal would create instability and exacerbate sediment shifting.

The DNR has argued that on-site conditions, engineering problems, and other factors made it infeasible to follow all the recommendations made prior to removal. Heavy rains also plagued the drawdown, requiring additional drainage and producing more sediment transport than anticipated. While ALJ Boldt credited some of the DNR's explanations, he ultimately found as follows:

> [I]t is not at all clear from the record why [the extenuating] conditions were not foreseeable to Department personnel.... The Department was well aware of public concerns relating to the release of sediment at the time of dam removal. The record is replete with concerns on this exact issue expressed well prior to design of the drawdown plan.... The record does not adequately explain why [alternative measures] could not be implemented. Further, if larger sedimentation basins could not have been constructed, the Department should not have represented to the public that it would build them, nor that the DNR's efforts to collect sediment would be adequate to protect the navigable waters of the river and North Lake.

. . . . .

A preponderance of the credible evidence supports a finding that a large amount of sediment was discharged into the Oconomowoc River and North Lake as a result of the partial removal of the Funk's Dam. The record taken as a whole also establishes that these navigable waterways have been detrimentally impacted by the manner in which the partial dam removal was undertaken.... The DNR had sound reasons for removal of the dam; the Department properly planned for removal of the dam. However, as the dam was removed, the Department was too quick to throw out its drawdown and removal plans as being impossible to perform....

ALJ Decision, Findings at ¶¶ 14, 19 (citations omitted).

The plaintiff alleges that silt, sediment and ongoing erosion continue to be discharged downstream through the channelized structure formed by the partially removed dam. As a result, large muck and silt bars which did not exist prior to removal have formed in the Oconomowoc River and at the river mouth in North Lake. The excess sediment transfer and silt deposits continue to impair the navigability of the river and lake and to damage the natural habitat of many species.

Prior to filing this action, plaintiff Froebel originally intervened in the state administrative review proceeding surrounding the removal of Funk's Dam, initiated by the North Lake Management District ("District"). *See North Lake*, 182 Wis.2d 500, 513 N.W.2d 703. In October 1992, the District filed a petition for a contested case hearing challenging the DNR's decisions to remove the dam and not to obtain an EIS regarding the project.[2] The DNR granted the District's request for a hearing on the dam removal but not on the need for an EIS. *Id.* Froebel was permitted to intervene before the District ultimately withdrew its request, leaving the plaintiff and

the DNR as the remaining litigants in a contested case hearing on the issue of dam removal. *See Froebel v. Wisconsin Dep't of Natural Resources*, 217 Wis.2d 652, 579 N.W.2d 774, 776 (Wis.App.1998). Specifically, Froebel sought to obtain an injunction ordering the DNR to halt the sediment discharge from the partially removed dam and to perform other remedial actions. *Id.*

The contested case hearing was held on March 6–8, 1995 in Milwaukee and April 4, 1995 in Waukesha. On February 21, 1996, ALJ Boldt issued his factual findings and legal conclusions, along with an order to remand the matter to the DNR for such actions as the agency in its discretion found appropriate. *See* ALJ Decision, Order. Froebel appealed to Waukesha County Circuit Court and then to the Wisconsin Court of Appeals. Both Wisconsin courts affirmed ALJ Boldt's findings and conclusions and concurred in this significant respect: Froebel's request for relief was rejected because Wisconsin law does not allow a state administrative or judicial authority to issue an injunction against the DNR. *See, e.g., Froebel*, 217 Wis.2d 652, ——, 579 N.W.2d 774, 776.

The plaintiff filed this action in federal court on June 6, 1997, seeking to hold the DNR and riparian owner Waukesha County accountable for the faulty removal of Funk's Dam and for the resulting transport of sediment under the citizen suit provision of the federal Clean Water Act, 33 U.S.C. § 1365. The plaintiff seeks injunctive relief to prevent further sediment transport through the remainder of the dam and to remedy current sediment accumulation in the Oconomowoc River and North Lake, attributable to dam removal. The plaintiff also requests that civil penalties be imposed on defendants, pursuant to 33 U.S.C. § 1365(a) and § 1319(d).

---

**2.** The dam removal hearing was stayed while Wisconsin courts determined whether § 227.42, Wis.Stat., confers a right to a contested case hearing on the need for an EIS. The Wisconsin Court of Appeals found no such right. *North Lake* at 506, 513 N.W.2d 703. In reaching this conclusion, the court relied on *Wisconsin's Envtl. Decade, Inc. v. Wisconsin Dep't of Natural Re-*

*sources*, 115 Wis.2d 381, 340 N.W.2d 722 (1983), which held that the decision whether to hold a contested case hearing on the need for an EIS is within the DNR's sound discretion, as long as an opportunity for public participation exists and a reviewable record is assembled. *North Lake* at 505, 513 N.W.2d 703.

The court now turns to the defendants' motions to dismiss.

## II. ANALYSIS

Two propositions underlie my analysis of this unusual fact situation. First, the actions for which the DNR and agency officers are being sued—namely, the manner in which the DNR removed Funk's Dam and the agency's subsequent inaction in the face of volume sediment shifting—are not *enforcement actions*. Removing a dam is an activity which private parties undertake, as well as, on occasion, state regulatory agencies. While the scope of agency discretion remains relevant to this action in many respects and is discussed below, the mere assertion of agency discretion in this context does not carry the same weight as it would in a classic enforcement setting. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ( "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); *and Village of Menomonee Falls v. Michelson*, 104 Wis.2d 137, 145, 311 N.W.2d 658 (Ct.App.1981) (overturning civil enforcement decision requires proving "intentional, systematic and arbitrary discrimination").

Second, the significance of permit requirements under the CWA or any environmental regulatory scheme is that the process of obtaining a permit generally requires an applicant to comply with certain common procedural safeguards—such as, for example, meaningful public notice requirements or requirements to monitor and report pollutant discharge. *See, e.g.,* Wis.Stat. § 283.39 and § 283.55. Thus, the fact that one of Froebel's claims suggests that the DNR was required by federal law to issue *itself* a permit is not, on its face, nonsensical. The gravamen of such a claim is simply that the agency should have followed its own procedural safeguards, which presumably would have prevented or minimized the alleged pollutant discharge.

I turn now to defendants' dispositive motions. In reviewing a complaint pursuant to any motion to dismiss, I assume all well-pleaded facts to be true, and draw all reason-able inferences from those facts in favor of the plaintiff. *Gutierrez v. Peters*, 111 F.3d 1364, 1368–69 (7th Cir.1997). This court will dismiss an action pursuant to a 12(b)(6) motion for failure to state a claim if, under this generous standard, the plaintiff can prove no set of facts that would entitle him to relief. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The following analysis first addresses the state defendants' assertion of sovereign immunity, then determines the preclusive scope of the state administrative proceedings and judicial review, and finally discusses the remaining defendants' 12(b)(6) motions to dismiss with respect to both counts.

### A. Sovereign Immunity

The Wisconsin defendants—a state agency and two officers of that agency—have moved to dismiss this action against themselves based on Eleventh Amendment sovereign immunity. The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The above text restricts only Article III diversity jurisdiction. The Supreme Court, however, has consistently construed the Amendment to bar federal question jurisdiction over suits brought against unconsenting states by their own citizens, thus enacting a blanket immunity for states from privately initiated suits in federal court. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and progeny). The *Hans* interpretation of sovereign immunity has been roundly criticized by jurists and scholars as textually unwarranted and fundamentally at odds with two bedrock constitutional principles: that every right has a remedy and that federal judicial power is coextensive with the supremacy of federal law. *See generally* Vicki C. Jackson, *The Supreme Court, the Eleventh Amendment,*

*and State Sovereign Immunity,* 98 Yale L.J. 1, 3–13 (1988), *and* Akhil Reed Amar, *Of Sovereignty and Federalism,* 96 Yale L.J. 1425, 1466–92 (1987) (both citing *inter alia Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)); *see also* J. Brennan's dissenting opinion in *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 247–304, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

Federal courts have circumvented the severe restriction on federal jurisdiction implied by this understanding of sovereign immunity in a number of ways. Principally, courts will find that a state has waived immunity and consented to suit; that Congress has effectively abrogated state sovereign immunity; and, finally, that citizens may sue state officials for prospective injunctive relief when the officials remain in violation of the Constitution or federal law, by pretending that the state itself is not the defendant in those instances. The plaintiff here relies solely on this last method of overcoming sovereign immunity, the so-called *Ex parte Young* exception. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), established the legal fiction that when state officers in their official capacity act *ultra vires* to the Constitution or federal law, they cannot represent the state because the state *qua* state cannot authorize unconstitutional or illegal conduct. However, the *Ex parte Young* exception, to the extent available, will only subject individual state officers to suit, but does not overcome Eleventh Amendment immunity for state agencies such as the DNR. *See, e.g., Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (". . . [*Ex parte Young*] has no application in suits against the States and their agencies, which are barred regardless of the relief sought . . ."). Therefore, in order for the DNR to remain a defendant in this action, the agency's immunity must be overborne in some other fashion.

### 1. Congressional Abrogation

■ Froebel does not assert that the DNR has consented to suit or that the CWA citizen suit provision, 33 U.S.C. § 1365, represents a valid congressional abrogation of state sovereign immunity. And, indeed, after *Seminole*

*Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the abrogation claim for an environmental statute such as the CWA appears difficult, if not impossible, to maintain. *Seminole Tribe* established a two-part test for determining whether a federal statute effectively abrogates the states' Eleventh Amendment shield. *Id.* at 1123. Section 1365 of the Act fails both tests, though not without troubling implications for environmental citizen suits in general.

#### a. Clear intent to abrogate

Under *Seminole Tribe,* a court must first determine if the statutory language clearly and unequivocally expresses Congress' intent to abrogate sovereign immunity and subject states to suit. *Id.* Section 1365 of the Act, which plaintiff claims affords him the right to sue the DNR, states:

> . . . any citizen may commence a civil action on his own behalf—
>
>> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency *to the extent permitted by the eleventh amendment to the Constitution*) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . .

33 U.S.C. § 1365(a) (emphasis added). The definition of "person" as used in the Act includes states. 33 U.S.C. § 1362(5). While enigmatic, Congress' reference to the Eleventh Amendment in § 1365 can hardly be said to constitute the necessary "clear legislative statement" of an intent to dispel sovereign immunity in citizen suit actions under the CWA. *Seminole Tribe* at 1123. This—and the fact that states have rarely been sued under the Act once it was established that state enforcement actions are not subject to suit, *see, e.g., O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642, 648 (E.D.Pa. 1981)—may account for the dearth of cases interpreting the § 1365 "to the extent permitted by . . ." language. Nevertheless, the plainest meaning of this language is that, far

from being abrogated, the Eleventh Amendment retains some presumptive force under the Act.[3]

## b. Valid exercise of power

More importantly, *Seminole Tribe* established a second line of inquiry to determine whether sovereign immunity has been validly abrogated by statute: the statute itself must have been passed "pursuant to a valid exercise of power." *Seminole Tribe* at 1124. And *Seminole Tribe* goes on to conclude that the Interstate Commerce Clause no longer constitutes the necessary grant of authority to Congress to abrogate state immunity. *Id.* at 1125–28. A majority of five justices in *Seminole Tribe* overruled the plurality opinion in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which seven years earlier upheld a congressional abrogation of sovereign immunity in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"). In *Union Gas*, the Court held both that the legislature had clearly stated its intention that states be held liable for cleanup costs under CERCLA, along with private parties;

and that the Interstate Commerce Clause authorized Congress to enact a statute to that effect. *Union Gas* at 5, 109 S.Ct. 2273.

*Seminole Tribe*, which involved a suit against the State of Florida under the federal Indian Gaming Regulatory Act ("IGRA"), expressly overruled *Union Gas* as to the latter holding, finding instead that Congress had no power to abrogate state sovereign immunity under the Interstate Commerce Clause.[4] U.S. Const., art. I, § 8, cl. 3. After *Seminole Tribe*, Section 5 of the Fourteenth Amendment remains the only valid basis upon which Congress can override sovereign immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) ("We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts.") *Seminole Tribe*'s contraction of Congress' abrogation authority thus deflates citizen suit jurisdiction under not only § 1365 of the CWA, but numerous environmental citizen suit provisions, all presumably passed pursuant to the Interstate Commerce Clause.[5] *See, e.g.*, the Toxic Substances Con-

---

3. In this context, "... to the extent permitted by the eleventh amendment to the Constitution ..." can mean that Congress intended citizens to sue either: (A) any "person" under the Act, but not states; or (B) any "person" under the Act, including states, but only in certain situations. The second possibility appears likely, since Congress could have simply said "excluding states" if it meant the jurisdictional bar to be applied without exception. The latter reading implies a sort of sovereign immunity continuum, which notion is consistent not with the Eleventh Amendment itself but with the contours of the *Ex parte Young* exception and other judicial constructions of sovereign immunity. Indeed, the Supreme Court has suggested that the CWA's citizen suit provision "implicitly authorized suit under *Ex parte Young.*" *See Seminole Tribe* at 1133 n. 17.

4. The IGRA was actually passed under the Indian Commerce Clause, also found at U.S. Const., Art. I, § 8, cl. 3. While noting that "[i]f anything, the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause," the Supreme Court essentially conflates the two in its analysis, finding that neither confers the necessary power to abro-

gate Eleventh Amendment immunity. *See Seminole Tribe* at 1126, 1125–28.

5. *Seminole Tribe* has spurred litigation over the source of Congress' authority in enacting legislation. See cases cited in footnote 53 in Vicki C. Jackson, *Seminole Tribe, the Eleventh Amendment, and the Potential Evisceration of Ex parte Young*, 72 N.Y.U.L.Rev. 495, 508 n. 53 (1997). Generally, these cases have involved claims by plaintiffs that a given federal statute was, or at least could have been, passed pursuant to Congress' powers under the Fourteenth Amendment, since that finding alone can preserve, an otherwise valid legislative abrogation of sovereign immunity. The Equal Protection, Due Process, and Privileges and Immunities Clauses have all been invoked, with mixed success, to assert Fourteenth Amendment authorization for an array of federal statutes, including the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, and even copyright, trademark, patent and bankruptcy statutes. *Id. See, e.g. Chavez v. Arte Publico Press*, 139 F.3d 504, 508–12 (5th Cir.1998) (finding abrogation of sovereign immunity in Copyright/Lanham Act unjustified by Fourteenth Amendment); *but see College Savings Bank v.*

trol Act, 15 U.S.C. § 2619; the Endangered Species Act, 16 U.S.C. § 1540(g); the Noise Control Act, 42 U.S.C. § 4911; the Resource Conservation and Recovery Act, 42 U.S.C. § 6972; the Clean Air Act, 42 U.S.C. § 7604; and CERCLA, 42 U.S.C. § 9659. In light of *Seminole Tribe*, the *Ex parte Young* exception, discussed below, assumes greater importance, as the only way for citizens to sue state defendants for injunctive relief under many environmental statutes. *See generally* Courtney E. Flora, *An Inapt Fiction: The Use of the Ex parte Young Doctrine for Environmental Citizen Suits Against States After Seminole Tribe*, 27 Envtl.L. 935 (1997).

As the above analysis makes clear, congressional abrogation fails to vitiate the defendants' immunity in this action. Therefore, the Wisconsin defendants' motion to dismiss based on sovereign immunity is granted as to the DNR, and the agency is dismissed from this action.

### 2. The *Ex parte Young* Exception

■ The plaintiff's complaint: also includes George Meyer, Secretary of the DNR, and Sturtevant,[6] the DNR assistant dam safety engineer, as defendants in this action. The plaintiff alleges that, in their capacity as DNR officials, Meyer and Sturtevant violated and continue to violate the Act by causing or allowing the impermissible and permitless discharge of pollutants from Funk's Dam. Under the judicial doctrine established by *Ex parte Young*, a suit alleging that a state officer violated federal law is not considered a suit against the state, and thus is not barred by the Eleventh Amendment. The theory of *Young* was that, since a state cannot authorize unconstitutional or illegal conduct, the officer's action is *ultra vires* and "stripped of [its] official or representative character." *Young*, 209 U.S. at 160, 28 S.Ct. 441. The Supreme Court has modified and limited *Young*'s basic holding and rationale over the years, but the *Ex parte Young* doctrine remains an essential mechanism by which citizens can seek relief against state actors in federal court.

#### a. *Edelman* and other limitations on *Young*

■ *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), represents the most significant qualification on the *Young* exception to sovereign immunity. *Edelman* held that *Ex parte Young* permits only prospective injunctive relief against state officers. *Id.* at 677, 94 S.Ct. 1347. Awards of retroactive monetary relief against

---

*Florida Prepaid Postsecondary Educ. Expense Bd.*, 148 F.3d 1343, 1347–52 (Fed.Cir.1998) (finding Patent Remedy Act validly abrogated sovereign immunity under the Fourteenth Amendment).

As courts have discovered, Congress does not always make its basis for action clear. But in the wake of *Seminole Tribe*, the Seventh Circuit has concluded that the appropriate question is not whether Congress did in fact enact a statute pursuant to the Fourteenth Amendment, but whether the objectives of the statute are within Congress' theoretical Fourteenth Amendment power. *See Doe v. University of Ill.*, 138 F.3d 653, 660 (1998). Applying this standard, the Seventh Circuit held that Title IX, 20 U.S.C. §§ 1681 *et seq.*, in conjunction with the Equalization Act, was enacted under Congress' Fourteenth Amendment antidiscrimination imperative, although prior cases had determined that the statute was a product of congressional power under the Spending Clause. *Id.* at 659–60.

Similarly, at least one writer suggests that environmental citizen suits to vindicate property interests are in some sense "authorized" by the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *See* F.J. "Rick" Din-

dinger II, *Seminole Tribe's Impact on the Ability of Private Plaintiffs to Bring Environmental Suits Against States in Federal Court*, 75 Denv.U.L.Rev. 253 (1997). However, the Supreme Court's opinion in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), clarified the substantive scope of Congress' power under the Fourteenth Amendment in such a way that litigation strategies of this type are likely to fail. A recent district court decision in Alabama distilled the import of *Boerne* as follows: "The teaching of *Boerne* is that there must be a substantial constitutional hook: the principal object of the legislation must be to address rights that are judicially recognized [as prohibited by the Fourteenth Amendment.]" *Reynolds v. Alabama Dept. of Transp.*, 4 F.Supp.2d 1092, 1107–08 (M.D.Ala.1998). Considered in this light, environmental statutes such as the Clean Water Act cannot pass the *Boerne* test, and the claim of Fourteenth Amendment authority for their enactment appears specious.

6. The complaint caption identifies Sturtevant as "an individual," rather than by his DNR title. Throughout the pleadings, however, Sturtevant is implicated for actions taken as a dam safety engineer for the DNR.

state officers, even if equitable in nature, will necessarily be paid out of the state treasury, so the *Young* fiction that the suit is not against the state collapses. *Id.* at 666–67, 94 S.Ct. 1347. As a threshold matter, then, the plaintiff's request that civil penalties be assessed against Meyer and Sturtevant under 33 U.S.C. § 1319(d) is barred. The irony, of course, which courts have recognized, is that compliance with injunctive orders properly issued under *Ex parte Young* will often have dramatic fiscal consequences for states. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (enjoining New York City welfare officials from terminating welfare benefits without a hearing).[7]

■ Another implication of the *Edelman* restriction to prospective injunctive relief under *Ex parte Young* is that the unconstitutional or illegal action complained of must be ongoing in some sense, or capable of being prospectively enjoined. As it happens, this requirement dovetails with a prerequisite for citizen suit jurisdiction under the CWA. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), held that the § 1365(a) language allowing citizens to sue "any person ... who is alleged to be in violation" under the Act required that citizen-plaintiffs allege "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney* at 57, 108 S.Ct. 376. Thus, Froebel must allege that both Meyer and Sturtevant, as well as Waukesha County, continued to violate the Act at the time he filed his complaint, in order to overcome sovereign immunity and secure citizen suit jurisdiction. He does.

■ The state defendants attempt to read another limitation into the *Ex parte Young* doctrine, so as to nullify its use for the plaintiff. The defendants argue that the prospective injunctive relief authorized by

*Young* must also be passive and involve no affirmative action on the part of the state. In making this claim, the defendants rely on *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and *Wisconsin Hosp. Assoc. v. Reivitz,* 820 F.2d 863 (7th Cir.1987).

In *Reivitz,* the plaintiff hospitals wanted to enjoin state officials from considering a Wisconsin statute—which temporarily froze Medicaid rate increases to hospitals—in calculating as-yet-unpaid reimbursements to hospitals for already-rendered services. *Id.* at 867. The Seventh Circuit held that such an injunction could not be considered prospective in nature because it essentially dictated a form of retroactive monetary relief and was thus barred by the Eleventh Amendment. *Id.* This court finds that the facts of *Reivitz* are inapposite to the present case, and that the injunction was denied not because it required affirmative action by the state but because the requested relief involved make-whole payments from the state treasury.

The defendants also cite note 11 in *Larson,* which states:

> Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.

*Larson,* 337 U.S. at 691 n. 11, 69 S.Ct. 1457. Referring to this as *"Larson's* famous and debatable footnote 11," the Seventh Circuit has followed the lead of other circuits in declining to read the above language as "clos[ing] the courthouse doors to litigants solely because affirmative action may be required on the part of the government."

---

7. In some fact situations the result of *Edelman's* distinction is especially ironic:

> Federal courts may enjoin state officials in their official capacity to pay money out of the state treasury for future obligations, but may not order them to charge the public fisc to make whole victims of past constitutional wrongdoing. Perversely, a state government that spends money to avoid violating the Constitution ends up financially worse off that one that cynically flouts higher law until ordered into prospective compliance.

Amar, *supra,* at 1479.

*Schlafly v. Volpe,* 495 F.2d 273, 278, 279 (7th Cir.1974). Rather, the Seventh Circuit construed *Larson*'s footnote as potentially barring a suit in only exceptional cases, "where to do otherwise would impose an intolerable burden on government functions, outweighing any consideration of private harm." *Id.* at 280 (internal quotation marks omitted). Contrary to defendants' suggestion, *Schlafly* is still good law in this circuit, and rather than being diminished by recent Supreme Court rulings on the *Ex parte Young* doctrine is, in fact, echoed by the prevailing rationale in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). *See infra* discussion. In any event, I find that the remedial actions requested by plaintiff would not impose an "intolerable burden on government functions," such as contemplated by *Larson. See, e.g., Committee to Save Mokelumne River v. East Bay Mun. Util. Dist.,* 13 F.3d 305 (9th Cir.1993) (finding that action against members of state water quality control board was not barred although it requested remedial actions to remove and dispose of contaminated sediment).

### b. *Young* after *Seminole Tribe* and *Coeur d'Alene*

*Seminole Tribe* and the more recent *Coeur d'Alene*—decided just after the plaintiff filed this action—whittle away at the scope of the *Ex parte Young* exception still further. Neither decision, however, impacts the availability or application of the *Young* doctrine in the present action.

In addition to finding that Congress lacks power to abrogate the states' sovereign immunity through legislation passed pursuant to the Commerce Clause, *Seminole Tribe* held that the *Ex parte Young* mechanism for circumventing sovereign immunity may be unwarranted when the statute at issue already prescribes a "detailed remedial scheme

for the enforcement against a State of a statutorily created right." *Seminole Tribe,* 116 S.Ct. at 1132. Of course, under the Supreme Court's initial holding in *Seminole Tribe,* such a remedial scheme will fail to subject a state to suit if the legislation was a Commerce Clause enactment, because that abrogation of state immunity is now invalid. The Court's reasoning, somewhat counterintuitive, was that the presence of a complex remedial scheme directed at states was evidence of Congress' desire to *limit* the liability of states under the statute, rather than expose them to the potentially *greater* risks of *Ex parte Young* litigation. *Id.* at 1133 ("By contrast with this quite modest set of sanctions, an action brought against a state official under *Ex parte Young* would expose that official to the full remedial powers of the federal court, including, presumably, contempt sanctions.") Thus, although the remedial scheme itself is ineffective against the state under *Seminole Tribe,* suits under *Ex parte Young* are also precluded, in order to hew as closely as possible to perceived congressional intent. The ironic result is that, with respect to the very statutes in which Congress has shown its desire to subject states to suit, not only will abrogation fail, but the *Young* exception will also be unavailable to plaintiffs.[8]

However, footnote 17 in *Seminole Tribe* saves considering the relative complexity of the CWA's remedial scheme as directed at states. The note states:

[W]e do not hold that Congress *cannot* authorize federal jurisdiction under *Ex parte Young* over a cause of action with a limited remedial scheme.... In this regard, [the IGRA] stands in contrast to the statutes cited by the dissent as examples where the lower courts have found that Congress implicitly authorized suit under *Ex parte Young.* Compare 28 U.S.C. § 2254(e) [sic] (Federal court authorized to

---

8. *See supra* Jackson, 72 N.Y.U.L.Rev. at 510–30, who argues that the reasoning of *Seminole Tribe* rests on the mistaken assumption that *Ex parte Young* always affords a free-standing remedy that is somehow broader than a statutory enforcement scheme:

Logically, the Court's reasoning is flawed because it conflates the implied cause of action

aspect of *Ex parte Young,* arguably of no relevance in a case involving a statutory cause of action and clear congressional intent for federal courts to help enforce the states' duty to [comply with the IGRA], with the Eleventh Amendment avoidance aspect of *Ex parte Young.*

*Id.* at 520.

issue an "order directed to an appropriate state official"); ... *33 U.S.C. § 1365(a) (authorizing a suit against "any person" who is alleged to be in violation of relevant water pollution laws).*

*Id.* at 1133 n. 17 (latter emphasis added). Thus, the Supreme Court indicated its belief that the reasoning of *Seminole Tribe* does not bar *Ex parte Young* suits under the CWA.

Although *Coeur d'Alene* also restricts the scope of the *Young* exception, the extraordinary factual context of the decision limits its holding to a narrow exception to the *Young* doctrine. In that case, the Coeur d'Alene Indian Tribe alleged ownership in the submerged lands and bed of Lake Coeur d'Alene and its tributaries and sought a declaratory judgment establishing the invalidity of all Idaho laws, customs, or usages regulating those lands, and an injunction prohibiting Idaho state officers from taking any action in violation of the Tribe's rights in the lands. *Coeur d'Alene,* 521 U.S. at —, 117 S.Ct. at 2030. The Tribe claimed the right to sue the Idaho state officers under *Ex parte Young,* to enjoin ongoing violations of privileges secured by federal law.

The Supreme Court denied all requested relief, concluding that *Young* did not apply in this context and the Tribe's claims were therefore barred by Eleventh Amendment immunity. But the Court's reasoning was quite narrowly drawn:

> [T]his case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests....
>
> ... [S]ubstantially all benefits of ownership and control would shift from the State to the Tribe. This is especially troubling when coupled with the far-reaching and invasive relief the Tribe seeks, relief with consequences going well beyond the typical stakes in a real property quiet title action.

The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State. The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory.

*Id.* at 2040. Although there is some disagreement between the lead opinion (signed by two justices) and the plurality opinion (signed by three justices) as to the proper inquiry in evaluating a claim for relief under *Ex parte Young,*[9] both camps arrive at the same conclusion that the extraordinary relief requested by the Tribe made it impossible to maintain the *Young* fiction in this instance: "Where a plaintiff seeks to divest the State of all regulatory power over submerged lands ... it simply cannot be said that the suit is not a suit against the State." *Id.* at 2047.

The Wisconsin defendants suggest that *Coeur d'Alene* controls here because Froebel's claims in this action also implicate the state's sovereign interest in its navigable waters. The court, however, does not find the comparison persuasive. The discrete remedial actions sought by the plaintiff in this case would not amount to the expansive and permanent incursion on sovereign interests indicated by the injunctive relief sought in *Coeur d'Alene.* Therefore, *Coeur d'Alene* also does not affect the plaintiff's recourse to *Ex parte Young* in this action.

**c. Relevance of *Pennhurst* to this action**

Based on the above analysis, it would appear that Meyer and Sturtevant are subject to suit under the *Young* exception to sovereign immunity. Before reaching that conclusion, however, I raise one more potential limitation on the application of the *Young*

---

9. Justice Kennedy's principal opinion advocates a "case-by-case" balancing approach to the invocation of *Ex parte Young,* in which federal courts should weigh the availability of prompt relief in a state forum and the relative importance of the federal right being vindicated before allowing a suit to proceed under *Young. See Coeur d'Alene* at 2035–40. Justice O'Connor's plurality opinion, arguably controlling, rejects the case-by-case analysis as unnecessarily complicating and narrowing the *Young* jurisprudence. *Id.* at 2045. Instead, the plurality reaffirms the validity of *Ex parte Young's* "straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 2047.

doctrine in this case, this time arising out of *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). *Pennhurst* essentially recast the rationale for *Young* as a matter of the supremacy of federal law rather than the "non-state" nature of *ultra vires* actions by state officers. *See* Jackson, 72 N.Y.U.L.Rev., *supra,* at 512. Under this rationale, prospective relief enjoining violations of state rather than federal law fell outside the scope of the *Young* exception to Eleventh Amendment immunity. Thus, *Pennhurst* held that citizens could not sue state officials in federal court for violations of state law, regardless of the relief sought. *Pennhurst* at 106, 104 S.Ct. 900.

*Pennhurst* involved a pendent state claim, which is not at issue here. This case obviously alleges violations of a federal statute, so it may seem unusual to invoke the *Pennhurst* rule in this context. However, plaintiff's first count alleges a failure to obtain a permit for the discharge of pollutants pursuant to 33 U.S.C. § 1342, the provision establishing a National Pollutant Discharge Elimination System ("NPDES"). Under § 1342(b) and (c), the Environmental Protection Agency ("EPA") may cede authority to devise and administer NPDES permits to state regulatory agencies, such as the DNR. Once a state permitting program is approved by the EPA, federal permitting authority under § 1342(a) is suspended. 33 U.S.C. § 1342(c)(1). Wisconsin's version of the NPDES permitting scheme, duly sanctioned by the EPA, is found at Wis.Stat. §§ 283.001–.95 and establishes a superceding Water Pollutant Discharge Elimination System ("WPDES"). *See* § 283.31, Wis.Stat. WPDES permits are issued, paradoxically given our present fact situation, by the Wisconsin DNR, the state's environmental regulatory agency.

Under the Act's federalist allocation of authority, the EPA and state regulatory agencies share concurrent enforcement authority over violations of state-issued permits. See 33 U.S.C. § 1319. Similarly, the discharge of pollutants *without* a permit is unlawful under both 33 U.S.C. § 1311(a) and Wis.Stat. § 283.31(1). However, Congress clearly intended the states to take the leading role in issuing and enforcing the NPDES system. *See, e.g., District of Columbia v. Schramm,* 631 F.2d 854, 863 (D.C.Cir.1980) ("The state courts are the proper forums for resolving questions about state NPDES permits, which are, after all, questions of state law."); *and State of California v. United States Dep't of the Navy,* 845 F.2d 222, 225 (9th Cir.1988) (finding that, once approved, state programs are administered under state law). Thus, the question of whether a permitless discharge of pollutants by the DNR, such as plaintiff alleges, violates state or federal law for the purpose of applying *Pennhurst* is a potentially complicated question that touches on federal supremacy, institutional practice and agency discretion. These issues are addressed more fully in the following sections.

As a general principal, however, the court rejects the suggestion that state permitting authority divests federal courts of jurisdiction to hear citizen suit complaints alleging CWA violations by state officials. Although the effect of *Pennhurst* in this context appears unclear, other federal courts have entertained citizen actions alleging violations of the Act's permit provisions by state officers without addressing this question. *See, e.g., Natural Resources Defense Council v. California Dep't of Transp.,* 96 F.3d 420 (9th Cir.1996); *Committee to Save Mokelumne River v. East Bay Mun. Util. Dist.,* 13 F.3d 305 (9th Cir.1993); *Mancuso v. New York State Thruway Auth.,* 909 F.Supp. 133 (S.D.N.Y.1995); *Pennsylvania Envtl. Defense Found. v. Mazurkiewicz,* 712 F.Supp. 1184 (M.D.Pa.1989).

Accordingly, I find that *Pennhurst* does not bar the application of *Ex parte Young* to plaintiff's claim that Meyer and Sturtevant were required to obtain a state WPDES permit. Thus, the DNR officials are subject to suit on both counts under the *Young* exception to sovereign immunity.

**B. Scope of Claim/Issue Preclusion**

Meyer and Sturtevant argue that both counts must be dismissed against them under the doctrine of claim preclusion. The defendants' assertion of claim preclusion arises out of the administrative decision and order issued by ALJ Boldt and subsequently af-

firmed by a Wisconsin circuit court and the Wisconsin Court of Appeals.

### 1. Summary of State Administrative Proceedings and Judicial Review

The ALJ Decision, issued pursuant to Wis. Stat. § 227.47, followed a contested case hearing on the removal of Funk's Dam. The contested case hearing was granted on a petition filed by the District, challenging the DNR's decisions to remove the dam and not to obtain an EIS regarding the project. *Froebel*, 217 Wis.2d at ——, 579 N.W.2d at 776. By the time of the hearing, Froebel intervened and the District withdrew, leaving the DNR and Froebel as the contesting parties. *Id.* Whatever may have been the initial focus of the District's challenge to the agency, the ALJ Decision identified the central issue at the hearing stage as "whether the Department's implementation of its decision to remove the Funk's dam was reasonable, necessary and appropriate based upon information foreseeable to the DNR at the time of dam removal." ALJ Decision, Findings at ¶ 11.

Petitioner Froebel specifically sought an order from ALJ Boldt, pursuant to Wis.Stat. § 30.03,[10] enjoining the DNR to perform remedial actions with respect to Funk's Dam and sediment loading in the surrounding waters. ALJ Boldt determined that the cited provision "does not provide legal authority for the Division to Order specific remedial actions in this matter." ALJ Decision, Conclusions at ¶ 6. Although ALJ Boldt does not discuss the state permitting program for water pollutant discharge in any length or detail, the last paragraph of his decision states:

The DNR in seeking the removal of the Funk's Dam was not "the owner or operator of a point source discharging Pollutants into the waters of the state" within the meaning of [Wis.Stat. § 283.37(1)]. No WPDES permit is necessary in connection with either removal of the dam or any continuing sediment transport emanating from the Funk's Dam.

ALJ Decision, Conclusions at ¶ 8.

Froebel appealed the administrative decision to state circuit court, challenging ALJ Boldt's legal conclusions (1) that Wisconsin law did not provide legal authority for an administrative law judge to order the DNR to perform specific remedial actions; and (2) that Wis.Stat. § 283.37(1)[11] did not require the DNR to obtain a WPDES permit in connection with Funk's Dam. *Froebel v. Wisconsin Dep't of Natural Resources*, No. 96–CV–623, slip op. at 2 (Waukesha County Cir. Ct. Dec. 27, 1996) ("Cir.Ct.Decision"). The circuit court reviewed Froebel's legal challenges de novo. *Loomis v. Wisconsin Personnel Comm'n*, 179 Wis.2d 25, 30, 505 N.W.2d 462 (Ct.App.1993). Affirming both legal conclusions, the court held that the remedial actions requested by Froebel "are not within the ALJ's power to order nor are they within the court's powers within the context of a Chapter 227 review."[12] Cir.Ct. Decision at 8. Although the circuit court accepted ALJ Boldt's factual finding that the Oconomowoc River and North Lake had been harmed by the dam removal, it opined: "Petitioner is in the wrong forum and this court is without power or jurisdiction to grant the relief requested." Cir.Ct. Decision at 9, 4.

---

10. Section 30.03(2), Wis.Stat., authorizes the district attorney or the attorney general (if requested by the DNR) to "abate any nuisance committed under this chapter." Section 30.03(4)(a), Wis.Stat., gives the DNR the authority to "request the hearing examiner to issue an order directing the responsible parties to perform or refrain from performing acts in order to fully protect the interests of the public in the navigable waters."

11. The Wisconsin Statutes were renumbered while Froebel's appeal was pending in state courts. This opinion uses current section numbering throughout.

12. Chapter 227 is Wisconsin's codification of administrative procedure and review. Wis.Stat. § 227.57 establishes the scope of review of a decision by an agency hearing examiner or administrative law judge. In general, the reviewing court is confined to the administrative record, it must find a specific ground for modifying or setting aside an agency order, and it should not substitute its judgment for that of the ALJ on discretionary matters. *See Barnes v. Department of Natural Resources*, 184 Wis.2d 645, 661–62, 516 N.W.2d 730 (1994).

Froebel appealed to the Wisconsin Court of Appeals, which considered the same legal questions, again under a de novo standard. The court of appeals affirmed, devoting much of its analysis to the statutory authority of the ALJ and the reviewing court: "The primary issue in this case is whether the DNR may be ordered, by either the ALJ or the circuit court, to take specific remedial actions based on findings made in the context of an administrative hearing under ch. 227, Stats." *Froebel*, 217 Wis.2d at ——, 579 N.W.2d at 778. The appellate court discussed and rejected each statutory authority to enjoin the DNR asserted by petitioner.[13]

On the issue of whether the DNR was required to obtain a WPDES permit for the removal of Funk's Dam, the court of appeals emphasized the importance of Wis.Stat. § 31.187, a section which Meyer and Sturtevant continue to stress in today's litigation. Section 31.187 states: "The department may remove or cause to be removed, in such manner as it deems fit, old and abandoned dams in streams in this state, upon giving 60 days' notice in writing to the owner thereof, if he can be found." Wis.Stat. § 31.187(1). According to the court of appeals, this provision governs dam removal by the DNR to the virtual exclusion of other Wisconsin statutory provisions, including Wis.Stat. § 283.31(1), setting forth the basic terms and conditions of the WPDES permitting scheme. *See Froebel*, 217 Wis.2d at ——, 579 N.W.2d at 780. The court identified the following reasons for this conclusion: (1) Sturtevant and another DNR official testified before the ALJ that the DNR does not require a WPDES permit for dam removal; (2) Wis. Stat. § 31.185, which requires private parties to obtain a permit before removing a dam, is the only relevant permit provision and does not apply to the DNR;[14] and (3) Wis.Stat. § 283.31(1) does not specifically mention dam removal or its potential consequences and

thus is trumped by § 31.187(1) under the rules of statutory construction. *Id.*

Finally, the court of appeals had this to say about the DNR's actions in connection with Funk's Dam:

> We join in the ALJ's criticism's of the DNR's practices in this case. We would expect the DNR, as the protector of this state's natural resources and the chief enforcer of our laws protecting those assets, to abide by the rules which it imposes and enforces on others. We would also expect it to abide by the promises and representations it makes to the public regarding its own activities.... However, we cannot rewrite the existing laws to accommodate Froebel's legitimate complaints.

*Froebel*, 217 Wis.2d 652, ——, 579 N.W.2d 774, 780–81.

### 2. Claim Preclusion

 Under the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, a federal court must afford a state court judgment "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). *See also* 28 U.S.C. § 1738. Thus, Wisconsin law governs my assessment of the claim preclusive effect of the administrative decision and review in this matter. *Starzenski v. City of Elkhart*, 87 F.3d 872, 877 (7th Cir.1996). In Wisconsin, "a final judgment is conclusive in all subsequent actions between the same parties [or their privies] as to all matters which were litigated or which might have been litigated in the former proceedings." *Northern States Power Co. v. Bugher*, 189 Wis.2d 541, 550, 525 N.W.2d 723 (1995). The following factors must be present in order for prior proceedings to bar a subsequent claim: (1) an identity between the parties or their privies in the prior and subsequent suits; (2) an identity between the causes of action in the two suits; and (3) a

---

13. These were, variously, Wis.Stat. § 30.03(4)(A), § 227.57(5), § 227.57(8), and § 227.57(9).

14. As a prerequisite to the granting of a permit under this section, the DNR may require applicants "to comply with such conditions as it deems reasonably necessary in the particular case to preserve public rights in navigable waters, to promote safety, and to protect life, health and property." Wis.Stat. § 31.185(5).

final judgment on the merits in a court of competent jurisdiction. *Id.* at 551, 525 N.W.2d 723.

▮ The present facts clearly satisfy the first and third factors. Meyer and Sturtevant are, for the purposes of party identity, indistinguishable from the DNR, *see id.* at 551–52, 525 N.W.2d 723; and two levels of Wisconsin courts have rendered final judgments on the legal merits of Froebel's claims. Although these were appeals of an administrative decision, the reviewing courts addressed legal questions de novo, and, in any event, the ALJ Decision itself may carry preclusive effect, *see Acharya v. American Fed'n of State, County & Mun. Employees,* 146 Wis.2d 693, 697, 432 N.W.2d 140 (Ct.App. 1988); *and Patzer v. Board of Regents of the Univ. of Wis. Sys.,* 763 F.2d 851, 858 (7th Cir.1985) ("In general, a judgment affirming an administrative decision is res judicata as to the claims adjudicated, no less than a judgment entered after a trial on the merits.")

A more difficult call is the second factor—identity between causes of action. Wisconsin follows a transactional approach to determining whether two suits involve the same cause of action. *DePratt v. West Bend Mut. Ins. Co.,* 113 Wis.2d 306, 311, 334 N.W.2d 883 (1983). Under the transactional view of the dimensions of a cause of action, drawn from the Restatement (Second) of Judgments, courts generally view claims in factual terms, "regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff." Restatement (Second) of Judgments § 24 cmt. a (1982). The factual basis for plaintiff's claims in this forum is clearly the same as that in the state administrative proceedings; indeed, the plaintiff incorporates ALJ Boldt's factual determinations by reference in his complaint.

However, courts recognize certain exceptions to the rule of claim preclusion. The Restatement (Second) of Judgments § 26 compiles a number of these exceptions, one of which appears relevant to the facts at hand. The transactional approach to determining identity of claims will not extinguish a subsequent cause of action if

[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief.

Restatement (Second) of Judgments § 26(c) (1982). *See also Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 382, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). As the comment to § 26(c) explains, the transactional claim preclusion rule is predicated on the assumption that the forum in which the first judgment is rendered put no barriers in the way of the plaintiff presenting his entire claim, including any demands for relief available to him under applicable law. When such barriers exist and worked against the plaintiff, to preclude him from a second action would be fundamentally unfair. Restatement (Second) of Judgments § 26 cmt. c (1982).

Wisconsin state courts can exert jurisdiction over a citizen suit under the Clean Water Act and order necessary injunctive relief, even against the DNR. *See, e.g., Kerns v. Dukes,* 707 A.2d 363, 368–69 (Del.1998) (finding state court jurisdiction over CWA citizen suit against members of Delaware Department of Natural Resources). But the same cannot be said for the state division of hearings and appeals, the administrative forum to which Froebel's initial claims were addressed. The authority and power of a state administrative agency is created by statute and defined solely by the legislature. *Jocz v. Labor & Indus. Review Comm'n,* 196 Wis.2d 273, 292, 538 N.W.2d 588 (Ct.App.1995). The unequivocal conclusion of the administrative decision in this matter, as well as the Wisconsin reviewing courts, was that ALJ Boldt did not have the statutory authority to enjoin the DNR to perform remedial actions. In addition, the circuit court and the Wisconsin court of appeals concluded that state courts, when reviewing an appeal of an administrative decision, are likewise constrained by

statute. Section 227.57, Wis.Stat., sets out the scope of judicial review of agency decisions. Froebel asserted no fewer than three provisions of § 227.57 as potential statutory bases to order injunctive relief against the DNR. Each one was rejected. While each tribunal acknowledged the merits of Froebel's underlying claim for relief, his central request for relief was barred because none of the courts had the authority to grant it.

In this respect, I find the plaintiff's predicament distinguishable from, for example, that of the petitioner in *Northern States Power Co. v. Bugher,* 189 Wis.2d 541, 525 N.W.2d 723 (1995). The question in that case was whether Northern States Power Company ("Northern") was barred by claim preclusion from pursuing its 42 U.S.C. § 1983 claim relating to the constitutionality of a state tax because it had already challenged its tax liability under the questioned provision before the Wisconsin Tax Appeals Commission, and then appealed an unfavorable decision there to state courts. The Wisconsin Supreme Court held that claim preclusion operated to bar further litigation under § 1983, although the issue of constitutionality had not been raised in the prior administrative proceedings. *Id.* at 545, 525 N.W.2d 723. Although in its § 1983 action Northern sought an order enjoining the Department of Revenue "from collecting the unconstitutional taxes," the company's underlying claim remained its own entitlement to a tax deduction. *Id.* at 547, 554, 525 N.W.2d 723. "Throughout the entire proceedings, Northern sought the same relief—a deduction from payment of its franchise taxes, based on the same incident—the DOR's determination that Northern was not entitled to the deduction." *Id.* at 555, 525 N.W.2d 723. Unlike the state administrative forum adjudicating Froebel's claims for relief in this case, the Tax Appeals Commission was presumably fully able to grant the deduction from tax liability sought by petitioner in *Northern States,* had the Commission found the deduction warranted on the merits.

The essence of the remedy sought by Froebel has always been and remains injunctive relief. In addition, the essence of the right granted by the CWA's citizen suit pro-

vision is the individual's ability to enjoin noncompliant parties to abide by the strictures of the Act. The court finds that it would be "fundamentally unfair" to eviscerate this federal right of action because of prior state proceedings that could not have granted the requested remedy under any circumstances. Therefore, the doctrine of claim preclusion does not bar Froebel's claims against Meyer and Sturtevant. *See also Brye v. Brakebush,* 32 F.3d 1179, 1185 (7th Cir.1994) ("Wisconsin law does not treat *res judicata* as an iron clad rule which must be implacably applied whenever its literal requirements are met, regardless of any countervailing considerations.")

## 3. Issue Preclusion

 My analysis of the preclusive effect of the ALJ Decision and judicial review does not end with a discussion of claim preclusion, however. The doctrine of issue preclusion also prevents relitigation of an issue of fact or law previously determined by a valid final judgment in an action between the same parties. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Heggy v. Grutzner,* 156 Wis.2d 186, 192, 456 N.W.2d 845 (Ct.App.1990). A party who was not involved in the prior action may also assert issue preclusion offensively, in order to prevent relitigation of an issue conclusively resolved against another party. *Id.* at 193, 456 N.W.2d 845. Thus, both Meyer and Sturtevant as well as Waukesha County, which was not involved in the state administrative proceedings and review, may potentially assert issue preclusion arising from the ALJ Decision and judicial review.

The factual findings of ALJ Boldt do not appear disputed and are accepted as true at this stage, as they form part of the pleadings. Much of the legal analysis and conclusions of the administrative law judge and the reviewing courts concerned their own statutory authority to enjoin the DNR, which is not relevant to the plaintiff's substantive claims under the Clean Water Act. However, one paragraph of ALJ Boldt's Conclusions of Law, later affirmed in both the Wisconsin circuit court and court of appeals decisions, appears directly pertinent to today's litiga-

tion. Specifically, the administrative law judge found as a matter of law that the DNR, in connection with Funk's Dam, was not the owner or operator of a point source discharging pollutants into the navigable waters of the state. *See* ALJ Decision, Conclusions at ¶ 8. More expansively, ALJ Boldt held that "[n]o WPDES permit is necessary in connection with either removal of the dam or any continuing sediment transport emanating from the Funk's Dam." *Id.* As with claim preclusion, in determining the issue preclusive effect of this holding the court defers to Wisconsin law. *Starzenski* at 877.

Wisconsin courts cite the Restatement (Second) of Judgments §§ 27 and 28 as authority on the general rule of issue preclusion and exceptions to that rule. *See, e.g., Michelle T. v. Crozier,* 173 Wis.2d 681, 495 N.W.2d 327 (1993). The Restatement frames the general rule as follows:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Restatement (Second) of Judgments § 27 (1982). The rule itself suggests at least three implicit limitations on the issue preclusion doctrine: (1) that the issue in question was "actually litigated" in the first proceeding; (2) that the issue was decided by "a valid and final judgment"; and (3) that determination of the issue was "essential to the judgment."

Based on the procedural history of Froebel's claims, I find that the first and second limitations do not apply to this case. The issue of whether the DNR needed to obtain a WPDES permit for the removal of Funk's Dam was both "actually litigated" and subject to "a valid and final judgment" in state courts. In Froebel's appeals to both state circuit court and the court of appeals he explicitly requested review of ALJ Boldt's determination that dam removal by the DNR did not require a WPDES permit under Wis. Stat. §§ 283.37(1) and 283.31(1). *See* Cir.Ct. Decision at 2; *Froebel,* 217 Wis.2d at ——, 579 N.W.2d at 776. Both courts addressed

and decided the issue. *See* Cir.Ct. Decision at 8; *Froebel,* 217 Wis.2d at ——, 579 N.W.2d at 782. "When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of [the issue preclusion rule]." Restatement (Second) of Judgments § 27 cmt. d (1982). *See also Continental Can Co. v. Marshall,* 603 F.2d 590, 596 (7th Cir.1979). There is also no question that the ALJ Decision as affirmed by Wisconsin courts represents a valid and final judgment. *See* Restatement (Second) of Judgments § 13 cmt. g (1982).

Froebel argues that this issue has not been resolved at the administrative or state court level in a manner that can be considered a "final judgment" for preclusive purposes because the administrative law judge found that he lacked authority to order the requested relief. While the scope of ALJ Boldt's remedial authority does not affect the finality of the judgment as the plaintiff suggests, the real concern being raised by this argument is that the WPDES issue was not "essential to the judgment" in the administrative proceedings and review. The court finds some merit to this argument. The substantial portion of all three state decisions discuss the statutory authority of the administrative law judge and the reviewing courts with respect to injunctive relief. At each level, it does appear that the primary ground for rejecting Froebel's claims was the court's conclusion that its hands were tied. Thus, the legal conclusion that Wisconsin law does not require the DNR to obtain a WPDES permit for dam removal was in some sense tangential to the central holding that "[p]etitioner is in the wrong forum and this court is without power or jurisdiction to grant the relief requested." Cir.Ct. Decision at 4.

The "essential to the judgment" requirement for issue preclusion assumes that a nonessential determination is less likely to inspire close judicial attention or aggressive litigation by parties. *See* 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4421 (1981). Under these circumstances, extending the determination to an entirely different proceeding is deemed risky

and potentially unfair. On the other hand, an essential finding does not have to be so crucial that without it a judgment could not stand. "Rather, the purpose of the requirement is to prevent the incidental or collateral determination of a nonessential issue from precluding consideration of that issue in later litigation." *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed.Cir.1983).

Given the history of this case, the conclusion that the DNR is beyond permit requirements, while perhaps not necessary to sustain the administrative and state court decisions, cannot be said to be "incidental" or "collateral" to the heart of this litigation. Fundamentally, the plaintiff challenges the scope of DNR discretion when the agency acts in a non-enforcement capacity. Thus, the state courts' resounding conclusion that the WPDES permitting process does not encroach on that discretion hardly seems tangential. At least, the resolution of the WPDES issue was an alternate ground, which also may have denied Froebel his requested relief. Alternative holdings affirmed on appeal generally carry issue preclusive effect because appellate review suggests the issue has in fact received careful judicial consideration. *See County of Cook v. Lynch*, 648 F.Supp. 738, 740–41 (N.D.Ill.1986) (citing Restatement (Second) of Judgments § 27 cmt. o (1982)). In the present case, then, I acknowledge that the WPDES permit requirement received sufficient judicial attention and was adequately contested by the parties in the prior proceedings, effectively satisfying the concerns of the final requirement for issue preclusion. I also conclude that, although Wisconsin courts follow a "fundamental fairness" approach to issue preclusion, none of the accepted equitable factors apply to the instant situation. *See Michelle T.*, 173 Wis.2d at 688–90, 495 N.W.2d 327 (paraphrasing exceptions to the general rule of issue preclusion in the Restatement (Second) of Judgments § 28 (1982)).

Numerous cases have also held that prior state decisions concerning state-issued NPDES permits *do* carry preclusive effect in subsequent federal actions. *See, e.g., United States v. ITT Rayonier, Inc.*, 627 F.2d 996 (9th Cir.1980). In *ITT Rayonier*, the EPA brought a federal enforcement action challenging the meaning of a footnote pertaining to discharge standards in a state-issued permit, previously interpreted in a state enforcement action. The Ninth Circuit found that the EPA was bound by the state court's determination on the meaning of the footnote. The court concluded that the existence of concurrent enforcement powers did not negate preclusion principles, as the CWA "manifests no countervailing policy reasons to abrogate the doctrine known generically as res judicata." *Id.* at 1001–02. Froebel argues that *ITT Rayonier* and other cases are distinguishable from his citizen suit precisely because they involve successive enforcement actions by state and then federal courts under the CWA's notoriously ambiguous concurrent enforcement regime. *See* 33 U.S.C. §§ 1319, 1342(i), 1365; *see also generally* David R. Hodas, *Enforcement of Environmental Law in a Triangular Federal System: Can Three Not Be a Crowd when Enforcement Authority Is Shared by the United States, the States, and Their Citizens?*, 54 Md.L.Rev. 1552, 1577 (1995). However, the significance of this distinction is not apparent to the court. If anything, a defendant's assertion of issue preclusion is stronger in the context of successive citizen enforcement actions *by the same plaintiff.*

Froebel also argues that the statutory language and history of the CWA citizen suit provision reflect just such a "countervailing policy," warranting an exception to the normal rules of preclusion. He meaningfully cites the authorization and jurisdiction language in § 1365(a) as a congressional mandate that preclusion rules may never bar citizen suits under the Act. Section 1365 begins "*Except as provided* in subsection (b) of this section, any citizen may commence a civil suit on his own behalf ..." 33 U.S.C. § 1365(a) (emphasis added). Subsection (b) pertains to notice requirements. Citizen plaintiffs must notify the EPA, the state regulatory agency and the alleged violator no less than sixty days prior to filing; if either the EPA or the state commences an enforcement action within those sixty days, the plaintiff is barred from filing, although he

may intervene in the government action as a matter of right. 33 U.S.C. § 1365(b)(1).

The citizen suit notice requirements are genuine hurdles the plaintiff must clear before citizen actions are even authorized to commence under the Act. Similarly, the "Except as provided ..." language in § 1365(a) *authorizes* citizen suits and is jurisdictional in nature. I find no evidence that § 1365(a) was meant to dispose of every potential obstacle that may, as a practical matter, foreclose litigation on the merits of a citizen claim. Claim and issue preclusion are not jurisdictional bars but affirmative defenses which may be raised by litigants after a case is filed, usually on a summary judgment motion or a motion for judgment on the pleadings. *See, e.g., D & K Properties Crystal Lake v. Mutual Life Ins. Co. of N.Y.*, 112 F.3d 257, 259 n. 1 (7th Cir.1997).[15] Put another way, by finding that issue preclusion attaches to the prior determination of the WPDES issue, I am not preventing the commencement of Froebel's citizen suit under § 1365(a), but adjudicating one of his claims. Therefore, I find plaintiff's argument for an

15. In this case, defendants raise preclusion in a Rule 12(b)(6) motion to dismiss. However, as both parties appended the necessary administrative and state court decisions to their initial filings in this matter and no additional material appears necessary to adjudge the preclusive effect of the prior proceedings, I will construe the assertion of preclusion as a Rule 12(c) motion for judgment on the pleadings, to the extent of the issue precluded. *See* Fed.R.Civ.P. 8(c) and 12(c).

16. The Wisconsin defendants echo the logic of the state decisions in arguing that Wis.Stat. § 31.187(1)—granting the DNR authority to remove abandoned dams "in such manner as it deems fit"—essentially trumps the substantive state and federal law on water pollution discharge permits. I disagree with this logic both as a matter of statutory construction and on federal supremacy grounds.

The Wisconsin defendants and the state courts characterize § 31.187(1) as the more "specific" provision, which therefore prevails over the more "general" statutory prohibition against permitless pollutant discharge. *See, e.g., Froebel*, 217 Wis.2d 652, ——, 579 N.W.2d 774, 1998 WL 88355 at *6. I could just as reasonably characterize the detailed provisions relating to the terms and conditions of WPDES permits, *see* Wis.Stat. § 283.31, as more "specific" than the "general" discretionary authority granted by § 31.187.

exception to normal preclusion doctrine based on § 1365(a) unpersuasive.

■ Based on the preceding analysis, Froebel is precluded from relitigating the WPDES permit issue. However, I limit the scope of the precluded issue to the core legal conclusion reached by the Wisconsin courts and supported by the courts' analyses—namely, that the actual removal of the dam by the DNR did not necessitate a permit. Only the ALJ Decision alludes to "continuing sediment discharge emanating from the Funk's Dam." ALJ Decision, Conclusions at ¶ 8. ALJ Boldt's analysis, however, does not discuss the ramifications of ongoing discharge in any respect, but focuses exclusively on the reasonableness of the DNR's decision to remove the dam and on his own statutory authority. Similarly, the discussions by the circuit court and the court of appeals pertaining to the WPDES issue analyze only the interaction of the permit statutes and Wis. Stat. § 31.187(1) in governing dam removal by the DNR. As it happens, this court does not agree with the state courts' conclusion about the comparative weight of these provisions,[16] but because of issue preclusion doc-

But the real issue here is an implicit conflict between state and federal law. Section 283.31, Wis.Stat., is an analogue of the core provision of the CWA, 33 U.S.C. § 1311, which flatly prohibits the discharge of any pollutant from a point source into navigable waters without the appropriate permit, as a matter of federal law. State law, on the other hand, grants the DNR wide discretion to remove old and abandoned dams without a permit. Wis.Stat. § 31.187. Federal preemption doctrine, grounded in the Supremacy Clause, provides that in any conflict between state and federal law, federal law prevails. *See* U.S. Const. art. VI, § 2. One of the lesser ramifications of this doctrine is that "a state statute is void to the extent that it actually conflicts with a valid federal statute." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). It seems to me, therefore, a straightforward proposition that while the DNR has discretion under Wisconsin law to remove abandoned dams, it may not do so in contravention of federal water pollution discharge requirements.

Inarguably, Congress intended states to play the leading role in administering and enforcing the NPDES permit programs. 33 U.S.C. § 1251(b); *see also District of Columbia v. Schramm*, 631 F.2d 854, 860 (D.C.Cir.1980) (citing legislative history reflecting congressional desire to "put the maximum responsibility for the permit process in the States"). Further, § 1370 of the Act makes clear that states are free to adopt and enforce limitations on the discharge of

trine will give preclusive effect to the narrowest holding I believe was reached by the reviewing courts—that the dam removal project itself, when undertaken by the DNR, did not require a WPDES permit. Whether Meyer and Sturtevant or Waukesha County have been obligated *since dam removal* to obtain a permit in connection with the alleged ongoing sediment discharge from the partially removed dam remains a viable question in this action and is addressed in the following sections.

## C. Discussion of Plaintiff's Claims

Froebel alleges that the transfer or redeposit of indigenous sediment through Funk's Dam, which has been continuous since the faulty removal of the dam in 1992, is a discharge of pollutants within the meaning of the § 1311 of the Act. 33 U.S.C. § 1311(a). Section 1311 makes the discharge of any pollutant unlawful except in compliance with enumerated provisions. *Id.* Froebel contends that the sediment transfer at issue was subject to two of these provisions— § 1342 and § 1344—each of which provides for the issuance of permits to regulate pollutant discharge in certain fact situations. The plaintiff alleges that defendants were required to obtain a permit with respect to Funk's Dam under each of these provisions but failed to do so, thereby violating the Act.

This decision, like many which consider the existence of an unlawful pollutant discharge under § 1311, discusses the applicability of the identified permitting provisions to the facts of this case. In practice, a finding that defendants were legally not required to obtain the asserted permits is also a finding

that an unlawful discharge of pollutants under § 1311 has not in fact occurred.[17]

### 1. Count I—Discharge of Pollutants Without a § 402 Permit

Section 1342 establishes the NPDES permit program, largely administered by the states. 33 U.S.C. § 1342. Under federal law, NPDES permits (also " § 402 permits," referencing the public law number) are required for any given set of circumstances if five elements are present: "(1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) *a point source.*" *National Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 583 (6th Cir.1988). The parties dispute the presence or applicability of two of these elements to the facts surrounding Funk's Dam. The DNR officials and Waukesha County argue (1) that the partially removed dam is not a *point source* under the Act, and (2) that nothing has been *added* to the waters of the Oconomowoc River and North Lake since dam removal.

#### a. The point source requirement

The CWA defines a point source as "any discernible, confined and discrete conveyance, including *but not limited to* any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added). Dams are not specifically mentioned in this definition. However, cases considering the application of § 402 permit requirements to dams have not categorically exempted dams from the point source definition. *See Mokelumne River*, 13 F.3d at 308;

pollutants *more stringent* than those established by the Act. 33 U.S.C. § 1370. But the importance of states as the prime CWA enforcers; and regulatory draftsmen's strict liability credo with respect to state actors—if they, like any person under the Act, engage in the discharge of pollutants without a permit.

The distinction between agency enforcement and non-enforcement actions is crucial in this context: "[N]one of [the enforcement] provisions contains any mechanism for relief against the state itself except to the extent that the state is an actual discharger of pollutants in violation of the act." *Ringbolt Farms Homeowners Ass'n v. Town of Hull*, 714 F.Supp. 1246, 1253 (D.Mass.1989).

17. I could reach the same conclusion by organizing my analysis around § 1311, rather than the permitting provisions. For example, the rest of this decision could be reframed as follows: (1) a discharge of pollutants under § 1311 must involve an "addition"; (2) an "addition" occurs when a *point source* introduces pollutants from the outside world; (3) redeposited sediment constitutes an "addition" in only certain limited circumstances; (4) those circumstances do not apply to this case; (5) therefore there is no discharge of pollutants under § 1311.

*National Wildlife Fed'n v. Gorsuch,* 693 F.2d 156, 165 (D.C.Cir.1982) ("The parties agree that a dam can, in some circumstances, be a 'point source.' "). Whether or not a dam qualifies as a point source appears to turn on the existence of the other disputed element in this case—an *addition* of pollutants to the water. *See Consumers Power* at 586. Thus, the two elements essentially devolve into one in the context of this case. Accordingly, a discussion of the second requirement is dispositive of both.

### b. The addition requirement

■ The requirement that pollutants be added to the water from a point source derives from § 1362, which defines the "discharge of a pollutant" in part as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Act does not further define "addition." Among various kinds of potential point sources, dams present a unique problem because water, polluted and unpolluted, flows both into and out of dams. *Gorsuch,* 693 F.2d 156, remains the leading case on the applicability of the § 402 permit programs to dams. The sole issue before the Court of Appeals for the District of Columbia Circuit in *Gorsuch* was whether certain dam-induced water quality changes—among them "sediment release"—constitute a "discharge of a pollutant" as defined in § 1362(12) of the Act. *Id.* at 161.

The plaintiff in *Gorsuch,* National Wildlife Federation, sought an injunction ordering the EPA Administrator to require NPDES permits for all dams as a nondiscretionary matter. *Id.* The plaintiff argued broadly that any dam-induced change in water quality involves a "pollutant" and that release of polluted water through a dam into downstream waters constitutes an "addition" of a pollutant from a point source, requiring a § 402 permit. *Id.* at 165. The EPA argued for a narrower reading of § 1362(12), which would require § 402 permits for dams only in certain circumstances. The District of Columbia Circuit upheld the EPA's interpretation of the relevant terms, finding it reasonable and consistent with legislative intent,

and therefore entitled to great deference. *Id.* at 183.

The EPA's position was that an "addition" of pollutants from a point source within the meaning of § 1362(12) "occurs only if the point source itself physically introduces a pollutant into water from the outside world." *Id.* at 174–75. In keeping with this interpretation, the EPA has required § 402 permits where a dam pipe or spillway releases oil or sanitary wastes into water passing through the dam outlet works, and where a dam constructed for the treatment of municipal wastes discharges those wastes into the water. *Consumers Power* at 586. Similarly, the Ninth Circuit held that a NPDES permit was required where a dam structure collected polluted surface runoff from an abandoned mine site and channeled it into the dam reservoir. *Mokelumne River* at 308. Also following the EPA's interpretation of "addition" to, perhaps, an unnecessary conclusion, the Sixth Circuit held in *Consumers Power* that a hydroelectric facility's release of dead fish was *not* an addition of a pollutant requiring a § 402 permit because the fish were already in the water (albeit alive) before being killed in the dam's own power generating turbines. *Consumers Power* at 581.

Froebel's claim that the movement of indigenous sediment through Funk's Dam constitutes a "discharge of a pollutant" requiring a § 402 permit clearly fails given the EPA's interpretation of "addition," ratified in *Gorsuch.* The upstream silt and sediment now redeposited in the downstream waters of the river and lake were not "introduced" into water from the "outside world" by the operation or partial removal of the dam. *Gorsuch* at 174–75. Froebel attempts to escape this obvious point in the following manner.

First, he tries to distinguish *Gorsuch* and other cases cited by defendants by arguing that these cases involve operational dam systems, not abandoned, unsafe dams which have been partially breached. He suggests, in effect, that the EPA's interpretation of "addition" in *Gorsuch* merely reflects a special policy exemption for working dams that has no application in the context of an abandoned mill dam.[18] But the "addition" re-

---

18. While both parties refer to a de facto "exemp-

tion" for dams from NPDES permit require-

quirement—that a point source must physically introduce pollutants into the water from the outside world—is not explicitly, or even logically, limited to dams by *Gorsuch* and *Consumers Power. See, e.g., Consumers Power* at 583 (stating that all five elements must be present in "any given set of circumstances" for NPDES permit requirements to apply). Thus, even if the plaintiff believes that Funk's Dam, in its present condition, should not be considered a dam for NPDES purposes, he must still show that an "addition" of a pollutant from a point source, under § 1362(12), occurred in order to establish the need for a § 402 permit.

Next, having rejected the EPA's interpretation of "addition" in *Gorsuch,* Froebel argues that this court should apply an interpretation of "addition" that expressly encompasses the redeposit of sediment. To support this argument, he cites a number of cases, all of which I find distinguishable. As one example, the plaintiff cites *United States v. Sinclair Oil Co.,* 767 F.Supp. 200 (D.Mont.1990), which identified "an emerging consensus in the Circuit Courts that a redeposit of indigenous materials into the waters of the United States qualifies as an "addition" of pollutants to these waters, *for purposes of enforcing the Clean Water Act." Id.* at 204 (emphasis added). But *Sinclair Oil,* like the other cases relied on by Froebel, does not interpret "addition" in the context of § 402 permit requirements. Rather, *Sinclair Oil* involves the applicability of CWA enforcement provisions to defendant's failure to obtain a required dredging permit under § 1344—or a § *404* permit.

The substitution is understandable given the confusing organizational structure of the Act. To recap, the gateway to the CWA's regulatory maze is § 1311, which makes the "discharge of any pollutant" unlawful except in compliance with certain other provisions, including § 1342 and § 1344. Section § 1342 establishes the NPDES or § 402 permit system to regulate, again, the "discharge of any pollutant." 33 U.S.C. § 1342(a)(1). Section § 1344 establishes the separate § 404 permit system to regulate the "discharge of dredged or fill material." 33 U.S.C. § 1344(a). The obvious logic of this organization is that a § 1344 discharge of dredged or fill material is, like a § 1342 discharge, presumed to be a generic discharge of pollutants under § 1311. Were this not the case, failure to obtain a required dredging permit under § 1344 would not constitute a violation of § 1311, which in turn triggers much of the enforcement authority in the Act, including citizen suit jurisdiction. *See, e.g.,* 33 U.S.C. § 1319 and § 1365.

The final complicating factor is that § 1362, as we have seen, defines the "discharge of a pollutant" for the entire Act as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Because plaintiffs must often establish that a discharge of dredged or fill material is a discharge of pollutants under § 1311, a line of cases has emerged applying the § 1362(12) definition of pollutant discharge, including the concept of "addition," to facts involving the discharge of dredged material. In this context, courts have held that dredged material—almost by definition redeposited sediment, *see Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 924 n. 43 (5th Cir.1983)—constitutes an "addition" for the purpose of finding a violation of § 1311's prohibition on pollutant discharge, thereby triggering enforcement authority.

With that said, I do not believe the cases cited by plaintiff stand for the proposition that redeposited sediment also constitutes an "addition" within the meaning of pollutant

ments under the Act, the leading cases differ in their assessment of congressional intent on this issue. *See, e.g., Gorsuch* at 173 ("[W]hile Congress did not specifically exclude dams from the NPDES program, it expressed [no] specific intent to include them ..."); *but see Consumers Power* at 587 ("EPA's construction of the statutory term "addition" is, in our view, rooted in the general congressional policy that NPDES permits are not required for dam-caused pollution."). In any

event, the dam "exemption"—if it exists and whether or not of conscious design—is limited and not inconsistent with the understanding of "addition" in other contexts under the NPDES scheme. As with a pipe or other prototypical point source, if the dam itself adds pollutants to the water, rather than merely transmitting the water coming into it in whatever form, then it will be subject to the NPDES permit system. *Id.* at 586.

discharge under § 1342, or under the NPDES permit scheme. For example, in *Avoyelles* the defendants engaged in land-clearing activities and large-scale deforestation using bulldozers without obtaining a § 404 dredging permit. *Id.* at 901. The Fifth Circuit held that vegetation and other material redeposited during the clearing process was an "addition" such that a discharge of pollutants had occurred, violating § 1311 of the Act. *Id.* at 922. In the same vein, plaintiff also cites *United States v. M.C.C. of Florida, Inc.,* 772 F.2d 1501, 1505–06 (11th Cir.1985) (finding that uprooting and redeposit of sea grass and sediment by defendant's tugboat propellers was an "addition" such that the CWA's prohibition on pollutant discharge was violated); and *Rybachek v. United States Envtl. Protection Agency,* 904 F.2d 1276, 1285 (9th Cir.1990) (finding that placer mining in waterbeds, which involves excavating sediment and running it through a sluicing process that releases water with high concentrations of suspended toxic metals back into the river or stream, caused an "addition" such that a discharge of pollutants had occurred, subject to CWA regulation).

In sum, Froebel has not produced a case in which redeposited sediment is specifically held to be subject to § 402 permit requirements. But even if the above cases so held, I find the present facts distinguishable. The above cases all involve the active dredging of waterbeds and the related redeposit of dredged material. Accordingly, the defendants' activities in these cases are more appropriately covered by the § 404 permit process. The discussion of Count II in the following section makes clear why § 404 permit requirements do not attach to an ongoing redeposit of sediment such as the plaintiff alleges in this case.

Based on the preceding analysis, the EPA's interpretation of "addition" in the dam context remains more pertinent to this set of facts than the broader interpretation urged by plaintiff. Consequently, the continuing sediment transfer through Funk's Dam cannot be considered an "addition" of a pollutant from a point source, requiring a § 402 permit. In asserting defendants' failure to obtain an NPDES permit in connection with the dam, Froebel has failed to state a claim upon which relief can be granted under §§ 1311 and 1342 of the Act. Fed.R.Civ.P. 12(b)(6). Defendants' 12(b)(6) motions to dismiss Count I are therefore granted.

### 2. Count II—Discharge of Pollutants Without a § 404 Permit

■ Section § 1344 of the Act authorizes the United States Army Corps of Engineers ("Corps") to issue § 404 permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344. Regulations issued by the Corps, found at 33 C.F.R. § 323.2, define "discharge of dredged material" and other relevant terms in this provision. *See* 33 C.F.R. § 323.2(d). However, the § 323.2(d) definition of "discharge of dredged material" has been altered and realtered since the removal of Funk's Dam, most recently by a District of Columbia Circuit decision that affirms a lower court injunction prohibiting EPA enforcement of the so-called "Tulloch rule." *See National Mining Ass'n v. United States Army Corps of Eng'rs,* 145 F.3d 1399 (D.C.Cir.1998). As a preliminary matter, then, I should make clear which set of regulations I apply to the facts of this case, and why.

#### a. Applicability of the Tulloch rule

In 1986, the Corps issued a regulation defining the term "discharge of dredged material" as "any addition of dredged material into the waters of the United States," but expressly excluded from this definition "*de minimis,* incidental soil movement occurring during normal dredging operations." *See National Mining Ass'n* at 1401. In 1993, in response to litigation concerning the applicability of § 404 permits to wetland drainage activities, the Corps amended the definition, expanding its scope and eliminating the *de minimis* exception. *Id.* at 1401–02. The 1993 regulation reads, in relevant part:

[T]he term *discharge of dredged material* means any addition of dredged material into, including any redeposit of dredged material within, the waters of the United

States. The term includes, but is not limited to . . .

 . . . . .

(iii) any addition, including any redeposit, of dredged material, including excavated material ... which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

33 C.F.R. § 323.2(d) (1993) (amending 51 Fed.Reg. 41,232 (1986)).

Various trade associations engaged in dredging operations mounted a facial challenge to the 1993 amended regulation. The challenge was successful, and the United States District Court for the District of Columbia entered an injunction on Jan. 23, 1997, prohibiting the Corps and the EPA from enforcing the regulation, also called the "Tulloch rule" in reference to a party in the wetlands litigation. *See American Mining Congress v. United States Army Corps of Eng'rs*, 951 F.Supp. 267 (D.D.C.1997). The District of Columbia Circuit stayed the injunction pending appeal. The recent Court of Appeals decision in *National Mining Ass'n* affirms the district court decision and lifts the stay on the injunction, thereby invalidating and precluding enforcement of the Tulloch rule as of June 19, 1998. *National Mining Ass'n* at 1401. Based on this chronology, from Sept. 24, 1993—when the amended § 323.2(d) became effective, *see* 58 Fed.Reg. 48,424 (1993)—to June 19, 1998, the Tulloch rule's expanded definition of "discharge of dredged material" was subject to enforcement and legally binding on the parties.

Meyer and Sturtevant note, however, that the district court injunction was not stayed by the District of Columbia Circuit until June 25, 1997, although no authority is provided for this fact. *See* State Def.'s Br. in Supp. of Mot. to Dismiss at 29 n. 13. Assuming the defendants' information is correct, the injunction had effect from Jan. 23, 1997 to June 25, 1997. Froebel filed this action on June 6, 1997, arguably during a period when enforcement of the Tulloch rule was legally stayed and the 1986 regulations were binding. Meyer and Sturtevant argue that the Tulloch rule is not relevant to these proceedings for other reasons, as well. The regulations were not amended until 1993, meaning that when Funk's Dam was removed in October 1992 the applicable definition of "discharge of dredged material" was the one found in the 1986 regulations. Alternatively, they argue that any subsequent discharge connected to dam removal remains covered by the 1986 regulations under a grandfather provision in the 1993 rules. The provision in question, 33 C.F.R. § 323.2(d)(3)(iii) (1993), provides that if a § 404 permit was not required for a discharge of dredged material under the 1986 regulations, then any discharges associated with the same dredging activity will continue to not require a § 404 permit under the new regulations, subject to certain conditions. *See* 58 Fed.Reg. 45,036 (1993). In no event, however, was the grandfather period to extend beyond Aug. 25, 1996. 33 C.F.R. § 323.2(d)(3)(iii) (1993).

By my analysis, all of these arguments are unnecessary: § 404 permit authorization for the removal of Funk's Dam [19] or for any ongoing discharge associated with dam removal was not required under *either* the 1986 or 1993 definition of "discharge of dredged material." Because the plaintiff relies on the more inclusive 1993 Tulloch rule, however, I will analyze Froebel's claims under this standard, noting that my conclusions apply a *fortiori* to the earlier and now reinstated version of § 323.2(d).

**b. Discharge of fill material**

Before discussing the finer points of "dredged material," I note that § 404 permit requirements also attach to discharges of "fill material." 33 U.S.C. § 1344(a). The facts of this case, however, do not support the plaintiff's assertion that fill material has been discharged. The definition of "fill material" has not changed since the 1986 regulations: "The term *fill material* means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the

---

**19.** I reach this holding because issue preclusion forecloses only litigation on the need for a § 402, or WPDES permit prior to dam removal. There was no specific determination in the state courts that § 404 permit authorization was not required for dam removal by the DNR; indeed, the parties did not mention dredging permit requirements in the prior proceedings.

bottom elevation of an [sic] waterbody." 33 C.F.R. § 323.2(e). Reinforcing the conclusion that fill material must be *purposefully* discharged to trigger § 404 permit requirements, the regulations include the following examples of discharges of fill material:

> Placement of fill that is necessary for the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices . . .

33 C.F.R. § 323.2(f).

Froebel argues that since the only "purpose" served by the muck and silt bars formed downstream of Funk's Dam is to change the bottom elevation of the Oconomowoc River and North Lake, the redeposited sediment may be considered fill material under the above definition. The plaintiff maintains, in effect, that the defendants' intent should not bear on whether or not the transported sediment constitutes fill material. In fact, the regulations compel precisely this understanding of fill material—"any material *used* for the *primary purpose*" of changing bottom elevation. 33 C.F.R. § 323.2(e) (emphasis added). I cannot stretch the meaning of this straightforward definition to include material not intentionally used for any purpose by defendants, or anyone for that matter. The sediment redeposited downstream by the removal of Funk's Dam is therefore not fill material within the meaning of the applicable regulations.

### c. Discharge of dredged material

As previously noted, the Tulloch rule enlarged the scope of the term "discharge of dredged material." The Corps' definition of just "dredged material," however, did not change in 1993 and remains singularly unhelpful: "The term *dredged material* means material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). According to Webster's Third New International Dictionary 791 (1986), to excavate means "to hollow out" or "to dig out

and remove." Similarly, to dredge means "to catch, gather, or pull out with a dredge" or "to deepen with a dredging machine: excavate with a dredge." *Id.* at 688. Fundamentally, plaintiff's claim that § 404 permit requirements apply to this case fails because the ongoing sediment transfer through Funk's Dam does not involve material that has been actively "dredged" or "excavated," as these terms are commonly understood and, indeed, as they are defined by implication by the entire structure of the CWA's § 404 permit system. *See* 33 U.S.C. § 1344.

Section 1344 of the Act and Part 323 of the Code of Federal Regulations, which together establish a detailed framework for the § 404 permit system, are replete with examples of dredging and fill-placing *activities*. The definition of "discharge of dredged material" is a good example: "any addition . . . which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." 33 C.F.R. § 323.2(d)(1)(iii); *see also, e.g.,* 33 U.S.C. § 1344(f) (listing numerous specific activities—including farming, silviculture, ranching, maintenance of dikes, dams, irrigation ditches and roads—which are exempted from otherwise-expected permit requirements under the Act). The CWA's interaction with the Rivers and Harbors Act, 33 U.S.C. §§ 401–467, is also instructive. Where actual dredging or excavation is regulated under the Rivers and Harbors Act, *see* 33 U.S.C. § 403, the CWA regulates the discharges associated with dredging activity. *National Mining Ass'n* at 1404. Accordingly, under § 1344 the Corps may issue permits to discharge dredged material "at specified disposal sites," suggesting again that the material itself is excavated and within the physical control of the permittee to dispose of in various ways. *See* 33 U.S.C. § 1344. The cases cited by plaintiff also uniformly support an understanding of dredged material as material removed from waterbeds and then redeposited by active dredging. *See Avoyelles,* 715 F.2d 897 (wetland landclearing and deforestation using bulldozers); *M.C.C. of Florida,* 772 F.2d 1501 (uprooting of sediment by tugboat propellers); *Rybachek,* 904 F.2d 1276 (placer mining).

The plaintiff asserts that the sediment "re-deposit" into the downstream waters of the river and lake is "incidental" to the "activity" of dam removal and therefore falls within the broad definition of "discharge of dredged material" under the Tulloch rule. *See* 33 C.F.R. § 323.2(d)(1)(iii). But a close reading of this section confirms that the redeposit, though incidental, must still be a redeposit "of dredged material." *Id.* That is, material that *has been dredged.* I simply do not think the CWA or the regulations issued by the Corps encompass a situation like the one at hand. Here, silt and sediment—itself not actively dredged, excavated, or otherwise mechanically disturbed—is redeposited over time due to the natural movement of water through a "discharging" structure such as the partially removed dam.

Froebel argues creatively that the shoddy removal of the dam left behind an outlet or hole which, due to physical principles, creates a "scouring action" that essentially excavates or dredges up the sediment in the dam impoundment and funnels it downstream. *See* Pl.'s Br. in Opp'n to Mot. to Dismiss by Waukesha County at 14. The plaintiff's argument is tempting. Powerful, scouring currents of water are sometimes expressly used to excavate and dredge waterbeds. But as the Wisconsin defendants stress, Meyer and Sturtevant have taken no action with respect to Funk's Dam since its partial removal in 1992. Indeed, Waukesha County, although the current riparian owner and thus potentially strictly liable for unlawful discharges emanating from the dam, never took any action *whatsoever* in connection with the dam. Given the structure of the Act and the Corps' regulations—which everywhere appear to contemplate the discharge of dredged material as a roughly immediate consequence of some activity consciously performed by the permittee—I cannot find that the gradual scouring occurring here, long after any activity by defendants, is producing and discharging "dredged material" within the meaning of the Act's § 404 permit system. The very novelty of plaintiff's interpretation underscores the unreasonableness of expecting defendants to have understood that they should secure permits to cover the continuous discharge of "dredged material," although they were not actually dredging anything.

Because the ongoing sediment redeposit alleged by plaintiff does not involve material that has been actively dredged, there has been no "discharge of dredged ... material" under 33 U.S.C. § 1344(a). Thus, a § 404 permit was not required in connection with Funk's Dam. In asserting defendants' failure to obtain such a permit, Froebel has failed to state a claim upon which relief can be granted under §§ 1311 and 1344 of the Act. Fed. R.Civ.P. 12(b)(6). Defendants' 12(b)(6) motions to dismiss Count II are therefore granted.

### III. CONCLUSION

Six years after its partial and poorly implemented removal of Funk's Dam, the DNR has narrowly escaped accountability under the Act. While Froebel is finally in the right forum to pursue his claims for injunctive relief against the agency, unfortunately the Act, as currently drafted, appears to be the wrong statute to address the potentially severe consequences of improper dam removal on sediment distribution in navigable waters. *See* Michael T. Pyle, *Beyond Fish Ladders: Dam Removal as a Strategy for Restoring America's Rivers,* 14 Stan.Envtl.L.J. 97, 107–17 (1995) (discussing the engineering problems and ecological costs of dam removal). To the extent that an environmental policy favoring dam removal gathers legitimacy and momentum, *see, e.g.,* Timothy Egan, *Heralding a New Era, Babbitt Chips Away at Harmful River Dams,* N.Y. Times, July 15, 1998, and state and federal agencies play a more active role in not only regulating dam removal but actually undertaking the removal of dams, circumstances provoking citizen suits like the plaintiff's will become more common. In light of this, statutory protection addressing this emerging environmental dilemma may be warranted.

For the foregoing reasons, all defendants' motions to dismiss are **HEREBY GRANTED**, and the clerk shall enter judgment accordingly.

**SO ORDERED.**